## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

RALPHAEL RAYSHAWN BOBO                                        PLAINTIFF
ADC #141276

V.                          No. 1:18CV00001-DPM-JTR

RYAN E. PFITZNER, Corporal,
Grimes Unit, ADC                                             DEFENDANT

## RECOMMENDED DISPOSITION

The following Recommended Disposition has been sent to Chief United
States District Judge D.P. Marshall, Jr. You may file written objections to all or part
of this Recommendation. If you do so, those objections must: (1) specifically explain
the factual and/or legal basis for your objection; and (2) be received by the Clerk of
this Court within fourteen (14) days of the date of this Recommendation. If you do
not file objections, Judge Marshall can adopt this Recommendation without
independently reviewing all of the evidence in the record. By not objecting, you may
waive the right to appeal questions of fact.

## I. Introduction

Plaintiff Ralphael Rayshawn Bobo ("Bobo") is a prisoner in the Varner Unit
of the Arkansas Department of Correction ("ADC"). He filed a *pro se* § 1983
Complaint alleging that, while he was incarcerated in the ADC's Grimes Unit, Ryan

E. Pfitzner ("Pfitzner"), Corporal Matthew Watson ("Watson"), Sergeant Corey Melton ("Melton"), Lieutenant Clinton Baker ("Baker") and Corporal Christopher Stump ("Stump") violated his constitutional rights. *Doc. 2.*

On February 19, 2019, the Court dismissed, for failure to exhaust administrative remedies, all claims except Bobo's claim that, on November 10, 2017, Pfitzner used excessive force by spraying him twice with chemical agents and then "slamming" him to the ground while his hands were restrained.[1] *Docs. 35 & 36.*

Pfitzner has filed a Motion for Summary Judgment, a Statement of Undisputed Material Facts, and a Brief in Support. *Docs. 41, 42 & 43.* He argues that: (1) sovereign immunity bars Bobo's claim against Pfitzner in his official capacity; and (2) qualified immunity shields him from liability for damages on Bobo's claim against him in his individual capacity.

In support of his Motion, Pfitzner has submitted: (1) his Declaration dated March 28, 2019 (*Doc. 41, Ex. A)*; (2) a transcript of Bobo's deposition taken on July 26, 2018 (*id., Ex. B*); (3) Melton's Declaration dated April 11, 2019 (*id., Ex. C); (4)*

---

[1]Specifically, the Court dismissed, without prejudice, Bobo's claims that: (1) Melton, Watson, Baker and Stump used excessive force against him when they helped Pfitzner restrain and forcibly carry him to the isolation shower; and (2) all Defendants were responsible for subjecting him to inhumane conditions of confinement in the isolation shower and delaying his receipt of medical care from a physician. *See Doc. 35 at 17-19.*

Watson's Declaration dated April 2, 2019 (*id., Ex. D*); (5) witness statements from five inmates (*id., Exs. E-I*); (6) ADC Administrative Directive 17-06 regarding use of force (*id., Ex. J);* (7) documents from the disciplinary proceedings initiated against Bobo regarding the November 10, 2017 incident (*id., Exs. K & L);* (8) medical records reflecting Bobo's receipt of medical attention immediately after the incident (*id., Ex. M);* (9) the report from an ADC internal affairs investigation into Bobo's allegations of excessive force (*id., Ex. N*); and (10) ten videos and two photographs (*Docs. 19 & 38).*[2]

Although notified of his right to file a Response to Pfitzner's Motion for Summary Judgment, Bobo has not done so. *See Doc. 46.* Thus, all issues are fully joined and ready for disposition.[3]

---

[2]One video recording ("Video Cam 65") shows the hallway and part of the metal detector area where the November 10, 2017 use of force incident with Pfitzner occurred. The other videos show the areas where Bobo was taken after that incident. *Doc. 19 (sealed).* The photographs show Bobo's face and hands after the incident. *Doc. 38 (sealed).*

[3]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

## II. Facts

The undisputed facts giving rise to Bobo's excessive force claim against Pfitzner are set forth below.[4]

1.    On November 10, 2017, Bobo was housed in general population at the Grimes Unit. He was a "Class IV" inmate[5] and had just been released from punitive isolation. *Doc. 41, Ex. B at 9-11*.

2.    Pfitzner is a correctional officer assigned to the Grimes Unit. His job duties include maintaining and assuring the safety and security of the unit. *Id., Ex. A*

---

[4]Although given the opportunity to do so, Bobo did not respond to Pfitzner's Motion for Summary Judgment or otherwise contest anything in his Statement of Undisputed Material Facts (*Doc. 42*). Accordingly, all of those facts, which form the basis for Pfitzner's Motion for Summary Judgment, are now deemed to be *undisputed*. *See* Fed. R. Civ. P. 56(e) ("If a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion."); *Jackson v. Ark. Dep't of Educ. Vocational & Technical Div.*, 272 F.3d 1020, 1027 (8th Cir. 2001) (citing Local Rule 56.1(c) in concluding that the plaintiff "forfeited her ability to contest the facts presented" by defendant by failing to respond to defendant's summary judgment motion).

The Court has, however, considered Bobo's sworn statements in his § 1983 Complaint (*Doc. 2*) and in his deposition (*Doc. 41, Ex. B*). *See* Fed. R. Civ. P. 56(c) (a party can show the existence of a genuinely disputed material fact through "depositions [and] affidavits or declarations"); *Ward v. Moore*, 414 F.3d 968, 970 (8th Cir. 2005) (providing a verified complaint made under threat of perjury "is the equivalent of an affidavit and can serve as [a plaintiff's] response to [a] defendant's summary judgment motion); *Roberson v. Hayti Police Dept.*, 241 F.3d 992, 994-95 (8th Cir. 2001) (complaint signed under penalty of perjury is equivalent of a verified complaint, and a plaintiff may rely on the facts stated therein just as if they had been stated in an affidavit).

[5]ADC inmates are classified as either I, II, III or IV, with IV being the lowest. *Doc. 41, Ex. B at 11*.

*¶ 1.* On November 10, 2017, Pfitzner was assigned to work security on the metal detector in the Zone 1 hallway. *Id., Ex. A ¶ 3.*

3.      Metal detectors are located throughout the Grimes Unit. Their purpose is to detect knives, shanks, metal objects, or other contraband or weapons. An inmate must place any metal objects on a tray, beside the detector, before walking through. Any item in the possession of a prisoner, which triggers the metal detector, is likely to jeopardize the safety and security of the inmates and officers in the unit. *Id., Ex. A ¶ 2, & Ex. B at 14-17.*

4.      Before November 10, 2017, Pfitzner and Bobo had never had any problems. *Id., Ex. B at 20.*

5.      On November 10, 2017, shortly after 10:00 a.m., Bobo left his barracks to go to the library. At approximately 10:35 a.m., he approached the metal detector in the Zone 1 hallway, where Pfitzner was the only officer working. *Id., Ex. A ¶ 3, & Ex. B at 13-14.* Bobo knew that he was supposed to walk through the metal detector. *Id., Ex. B at 15.*

6.      Instead of walking *through* the metal detector, Bobo walked *around* it. As he did so, the detector buzzed. *Id., Ex. A ¶ 3, & Ex. B at 15-18.*[6]

---

[6]In his Declaration, Pfitzner stated that Bobo walked "by" the metal detector. *Doc. 41, Ex. A ¶ 3.* In a grievance that Bobo filed the day after the incident, and in his sworn § 1983 Complaint in this action, he said he walked "past" the metal detector. *Doc. 2 at 4 & 11; Doc. 32 at 3.* In his deposition, Bobo first testified that he walked "through" the detector. *Doc. 41, Ex. B at 11 & 15.*

7.    Pfitzner gave Bobo a direct order to "come back" and "clear" the metal detector. *Id., Ex. A ¶ 3, & Ex. B at 20, 28.* "Clearing" the detector means walking through it until it does not go off. *Id., Ex. A ¶ 3.*

8.    *Instead of coming back and going through the metal detector*, Bobo said, "I am not clearing it [because] I have my MP4 in my pocket." *Id., Ex. A ¶ 3, & Ex. B at 11, 20-21.*

9.    In his Declaration, Pfitzner stated that he then gave another direct order, telling Bobo to hand him the MP4 radio, which he planned to return to Bobo after he cleared the detector by *walking through it*. According to Pfitzner, Bobo stated, in an aggressive manner, "Fuck you, I am not going through." Bobo then walked away from Pfitzner. *Id., Ex. A ¶ 3.*

10.    Video footage shows Bobo walking past the metal detector, turning around to face Pfitzner, then turning and beginning to walk away. *Video Cam 65 at 10:34:28-34:32.*[7]

---

Upon further questioning, he said he either walked "through it or by it," then finally admitted that he "was really just walking around the metal detector so [he] could just really go hurry up and get a book." *Id. at 15-18.* Bobo testified that, even if a person did not walk "through" the detector, it could still go off if the person was "close enough." *Id. at 19.*

[7]Video Cam 65 shows the events that transpired in the metal detector area during the incident between Bobo and Pfitzner on November 10, 2017. That video shows images captured at two-second intervals, beginning at 10:34:14 a.m. and ending at 10:36:50 a.m. For most of the video, Bobo and Pfitzner are visible only from the chest or shoulders down. While the video is taken from a distance, it is sufficient to establish that: Pfitzner stopped Bobo with an order or command; Bobo turned and faced Pfitzner; and Bobo turned and began walking away, without

11.     Because Bobo had not cleared the metal detector, had used aggressive language, and was walking away, Pfitzner believed Bobo might have a weapon or metal object that posed a physical threat to him and others. Pfitzner gave Bobo a direct order *to come back and go through the metal detector. Doc. 41, Ex. A ¶ 3.*

12.     Bobo admits that Pfitzner ordered him to come back and go through the metal detector and that he did not comply. *Id., Ex. B at 11-12, 22-26.* In his deposition, Bobo also admitted that that, after disobeying Pfitzner's direct order, he turned around, with his hands out to his sides, and said, "Why are you yelling?" *Id. at 12 & 23-24.* Finally, Bobo admitted he then turned around and began walking away from Pfitzner "to look for the sergeant …." *Id. at 24.*[8]

13.     Faced with Bobo's open defiance of his direct orders to walk through the metal detector, Pfitzner pulled out his chemical OC spray and gave Bobo another direct order to *go back through the metal detector. Id., Ex. A ¶ 4.* According to Pfitzner, Bobo turned and said, "Fuck you, I will beat your bitch ass." *Id.*

14.     In his deposition, Bobo testified that Pfitzner gave him a direct order to stop and, when Bobo saw that Pfitzner had pulled out his spray, he said "Why did

---

going through the metal detector.

[8]Bobo testified that, because Pfitzner was a "short-hair officer" who had recently started working at the ADC, Bobo wanted to "holler at the sergeant" to make sure Pfitzner was following the proper policy and procedure. *Doc.41, Ex. B at 29.*

you pull your mace on me?" *Id., Ex. B at 12, 22, 26.* Bobo said he did not "cuss out" or threaten Pfitzner. *Id. at 29, 48.* However, he admitted that, even after seeing that Pfitzner had pulled out his OC spray, he did not comply with Pfitzner's order to stop and go back through the metal detector. Instead, Bobo admits he turned his back on Pfitzner and walked "another step or two" away from Pfitzner. *Id. at 12, 22, 26.*

15.     Because Bobo had threatened him and was walking away, rather than complying with his repeated orders to stop and go back through the metal detector, Pfitzner deployed a short burst of spray in the direction of Bobo's head. *Id., Ex. A ¶ 4.* The spray made contact with the back of Bobo's head. *Id., & Ex. B at 12, 22-23.*

16.     According to Bobo, he then turned around to face Pfitzner and, with his hands out to his sides, asked Pfitzner "why did he spray me for," because Bobo was "posing no threat." *Id., Ex. B at 12, 22-23, 28-30.*

17.     Pfitzner then gave Bobo several direct orders to submit to restraints. When Bobo did not comply, Pfitzner radioed for assistance. *Id., Ex. A ¶ 5.* According to Pfitzner, Bobo then stated, "Fuck it, let's go" *Id.* In his deposition, Bobo admitted that Pfitzner gave him at least one direct order to "catch the cuffs." He testified that he then began "walking towards the wall and had [his] hands behind [his] back." *Id., Ex. B at 24, 26, 30-32.*

18.    Because Bobo used aggressive language and did not comply with Pfitzner's order to submit to restraints, Pfitzner deployed another short burst of spray, which made contact with either Bobo's back or chest. *Id., Ex. A ¶ 5, Ex. L, & Ex. B at 12, 23; see also Video Cam 65 at 10:34:34-34:42.*

19.    In his Declaration, Sergeant Melton states that he was in the back hallway conducting chow when he heard Pfitzner yell, "Hey you stop there." As Melton approached the metal detector area, he saw Pfitzner and Bobo standing about three or four feet apart. Bobo was walking toward Pfitzner, and he was "bowed up getting into the defensive position and looked like he was about to strike Cpl. Pfitzner." Melton heard Pfitzner give Bobo a direct order to submit to restraints, and he saw that Bobo was not complying. *Doc. 41, Ex. C ¶ 2.*

20.    In his Declaration, Corporal Watson stated that he and at least two other officers responded to Pfitzner's radio request for assistance. As Watson was approaching the area, he saw Pfitzner giving Bobo multiple orders to face the wall, get on his knees, and submit to hand restraints, and he saw that Bobo was not complying. *Id., Ex. D ¶¶ 2-3.*

21.    As Melton approached, he yelled at Bobo to kneel down and submit to hand restraints. Bobo then knelt. *Id., Ex. C ¶ 3, & Ex. D ¶ 3.* According to Bobo, he complied with Melton's order to "catch the wall and catch the cuffs" but told him,

"I don't know what's going on with your corporal … but the man just sprayed me, posing as no threat walking away from him." *Id., Ex. B at 12, 24-26, 30.*

22.    Video footage shows Melton approaching the metal detector area, where Pfitzner and Bobo are standing, facing each other, three to four feet apart. Bobo appears to have his back to the wall. As Melton approaches, Bobo turns to face him; within a few seconds, Bobo faces the wall and then he is no longer visible on the video, indicating that he has knelt down. *Video Cam 65 10:34:42-34:58.* The video shows three other officers running into the metal detector area. *Id. at 10:34:56-35:00.*

23.    Pfitzner placed the restraints on Bobo's left wrist. *Doc. 41, Ex. A ¶ 7 & Ex. D ¶ 3.* As he did so, Bobo stood up and attempted to move to his right, resisting. *Id., Ex. A ¶ 7, Ex. C ¶ 3, & Ex. D ¶ 3.* Bobo testified, in his deposition, that he was trying to stand up in response to an order given by one or more of the officers. *Id., Ex. B at 12-13, 27, 32-33, 36-37.*

24.    Multiple officers then placed Bobo on the floor. *Id., Ex. A ¶ 7, & Ex. D ¶ 3.* Another officer arrived with leg restraints, which were placed on Bobo. *Id.*

25.    Pfitzner did not touch Bobo other than to handcuff his left wrist. *Id., Ex. A ¶ 7, Ex. C ¶ 3, Ex. D ¶ 4, & Ex. B at 34.*

26.     The video confirms the other officers who arrived in response to Pfitzner's call for assistance. However, due to the number of officers around Bobo, it is impossible to see everything that occurs as Bobo is placed on the floor, handcuffed, and placed in leg restraints. *Video Cam 65 at 10:35:02-35:06.*

27.     In Bobo's Complaint, he alleged that, after his hands were restrained, "all of these officers" "slammed" him to the floor. *Doc. 2 at 5.* At Bobo's deposition, he was asked which specific officers "slammed" him to the floor. He said he did not know, but he knew that, afterwards, there were "four or five officers" on his back. *Doc. 41, Ex. B at 13, 27-28, 33-35.* Then he testified that "every one of the officers touched me *except for I want to say Pfitzner didn't touch me besides spraying me.*" *Id. at 34 (*emphasis added*).* This *admission* by Bobo makes it clear there is *no factual basis* for an excessive force claim against Pfitzner related to Bobo's claim that he was "slammed" to the floor by *other* unnamed guards.

28.     After Bobo's wrists and legs are restrained, Melton, Watson, Stump, and another officer carried Bobo to the showers for decontamination. *Id., Ex. A ¶ 7, Ex. C ¶ 3, & Ex. D ¶ 3; Video Cam 65 at 10:35:08-36:44.*

29.     Pfitzner was not among the officers who carried Bobo to the showers. *Doc. 41, Ex. A ¶ 7, Ex. C ¶ 3, Ex. D ¶¶ 3-4, & Ex. B at 36.*

30.    At least five inmates gave witness statements shortly after the incident. *Id., Exs. E-I.* Four of those inmates stated that Bobo failed to comply with one or more of Pfitzner's direct orders and was behaving in an aggressive manner.[9]

31.    At approximately 10:39 a.m., the four officers placed Bobo in the shower. *Video Cam 76 at 10:39:01.* Bobo's clothes were removed and he was

---

[9]Inmate #1 stated: "Inmate Bobo walked past the metal detector and it went off and the officer asked him to come back and try it again and Inmate Bobo *started cussing out the officer then he bowed up on him.* That's when he got sprayed then he [Bobo] started yelling that the officer sprayed him for [no] reason." *Doc. 41, Ex. E* (emphasis added).

Inmate #2 stated: "I saw an inmate *getting rowdy* in the hallway in Housing I. … The officer called backup and told inmate to face wall and get on knees for handcuffs. To me it looked as if the inmate Bobo *jumped at the officer* and the officer put him on the floor [until] backup came. One officer left and came back with leg irons. However, the officers had already pick[ed] up inmate and were carrying him … off. He was still *causing a ruckus* during all this." *Id., Ex. F* (emphasis added).

Inmate #3 stated: "Inmate Bobo *went crazy* when [the] officer told him to put his hands on the wall for standard procedure. He *did not do as the officer asked* so they put him in handcuffs and took him to segregation." *Id., Ex. G* (emphasis added).

Inmate #4 stated: "Ofc. Pfitzner ask[ed] I/M Bobo to go back through the metal detector. I/M Bobo complied by going back through the detector. Ofc. Pfitzner then sprayed I/M Bobo with OC for no reason after that. That's when I/M Bobo was thrown on the ground and hogtied." *Id., Ex. H.* Inmate #4's statement *directly conflicts* with the statements of Inmates #1, #2, #3 and #5 and, more importantly, *directly conflicts* with Bobo's own testimony, in which he *admits* that, *before* Pfitzner initially used OC spray, Bobo refused to obey his direct orders, one of which was to go through metal detector. Thus, Inmate #4's statement, that Pfitzner "sprayed I/M Bobo with OC for no reason," conflicts with the statements and testimony of every other eyewitness, including Bobo, and the *video* of the incident. Thus, on its face, Inmate #4's statement is made from "the whole cloth" and is unsupported by *any* facts in the record. *See fn. 11, infra* at page 16.

Inmate #5 stated: "[I]t was an officer telling Inmate Bobo to go back through the metal detector however inmate Bobo was trying to explain to the officer that he had already gone through the metal detector once so the officer kept on hollering at Bobo to go back through the metal detector *so Bobo never did* and so the officer pulled out his pepper spray and used it on Bobo and that's when other officers came and threw Bobo on the ground. Inmate Bobo never done anything to cause the officer any harm." *Id., Ex. I* (emphasis added).

allowed to wash the OC spray from his body. *Doc. 41, Ex. A ¶ 7, Ex. C ¶ 3, Ex. D ¶ 3, & Ex. B at 13, 42-43.*

32.    At 11:13 a.m., a nurse came in to examine Bobo. He told her that he had washed all of the OC spray off. *Id., Ex. M, & Ex. B at 50.* The nurse noted that, as Bobo was standing in the shower, he was calm and talkative; his respiration was even and unlabored; and he showed no signs of distress. *Id., Ex. M.*

33.    In his deposition, Bobo testified that, even after his shower, the spray was "somehow" burning the top of his head and his eyes. According to him, he told the nurse he was having trouble breathing and seeing. *Id., Ex. B at 44-45.* While there are disputed facts regarding the potential adequacy of Bobo's decontamination shower, none of those disputed facts are relevant to Bobo's excessive force claim against Pfitzner.

34.    Three or four days later, Bobo was examined by the nurse for problems with his shoulder. *Id., Ex. B at 45-46, 50.*[10] He did not complain at that time, or at any time thereafter, of any discomfort or injuries related to Pfitzner's spraying him with OC spray. *Id, Ex. B at 46-53, 55-58.*

---

[10]Bobo testified that, as the officers were carrying him out of the metal detector area, they pulled his shoulder out of its socket, which aggravated a preexisting injury and led to continued shoulder problems. *Doc. 41, Ex. B at 37-41, 45-48, 50, 52, 55.* However, Bobo has not asserted any claim against Pfitzner related to that alleged injury.

35.    After the November 10, 2017 incident, Pfitzner wrote a major disciplinary charging Bobo with two violations: (a) failure to obey staff orders; and (b) assault, verbal or written threat. *Id., Ex. A ¶ 8, & Ex. K.* On November 20, 2017, a disciplinary officer conducted a hearing, at which Bobo was allowed to make a statement. The hearing officer found Bobo guilty of both charges. Bobo did not appeal. *Id., Ex. K, & Ex. B at 62-64.*

36.    Deputy Warden Antwon Emsweller ("Emsweller") conducted a unit investigation of the November 10, 2017 incident, finding "insufficient evidence" that any security staff used excessive force. *Id., Ex. N at 3.*

37.    Internal Affairs Investigator Michael Deloney ("Deloney") conducted a further investigation of the matter. He reviewed: (a) Pfitzner's narrative, as contained in his incident report summary and disciplinary report; (b) statements from Melton, Watson and two other officers regarding the actions of Bobo and the officers involved; (c) the disciplinary court findings; (d) Emsweller's conclusion; and (e) Bobo's medical records, which showed "no visible injuries." *Id., Ex. N at 2-3.* In his report dated December 4, 2017, Deloney concluded:

> After reviewing the documentation presented, I find that there is insufficient evidence presented to support a willful intent to use "Excessive Force" in this case. I consider the force used by staff in this incident to have been reasonable. Additionally, I concur with the unit findings and the corrective/disciplinary action already taken at unit

level. Consequently, and in my opinion, no further investigation/action
is necessary.

*Id. at 3.*

### III. Discussion

### A.    Sovereign Immunity Bars Bobo's Official Capacity Claim Against Pfitzner

Pfitzner correctly argues that the doctrine of sovereign immunity bars Bobo

from maintaining an official capacity claim against him to recover monetary

damages. *See Reid v. Griffin,* 808 F.3d 1191, 1192 (8th Cir. 2015); *Murphy v.*

*Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997) (damages claims against state officials

acting in their official capacities are barred "either by the Eleventh Amendment or

because in these capacities they are not 'persons' for § 1983 purposes"). Because

monetary damages are the *only* form of relief sought by Bobo, his official capacity

claim against Pfitzner should be dismissed, with prejudice.

### B.    Pfitzner is Entitled to Qualified Immunity on Bobo's Individual Capacity Excessive Force Claim

1.    Standard

Qualified immunity gives government officials "breathing room to make

reasonable but mistaken judgments" and "protects all but the plainly incompetent or

those who knowingly violate the law." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866-67

(2017) (internal citations omitted). To determine whether an official falls into either

of these categories, the Court must ask "whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Id.* at 1867. As long as "a reasonable officer might not have known for certain that the conduct was unlawful," the officer is entitled to qualified immunity. *Id.*

Under well-established Supreme Court and Eighth Circuit case law, Pfitzner's claim of qualified immunity turns on whether: (a) the undisputed facts surrounding his use of two short bursts of OC spray, viewed in the light most favorable to Bobo, establish a violation of his constitutional rights;[11] and (b) those constitutional rights were clearly established at the time of the alleged violation. To avoid summary judgment, Bobo has the burden of demonstrating that the actions of Pfitzner violated his clearly established constitutional rights under the Eighth Amendment. *See Ashcroft v. Al–Kidd*, 563 U.S. 731, 735 (2011); *Church v. Anderson,* 898 F.3d 830, 832 (8th Cir. 2018).

---

[11]Although the Court must view the facts in a light most favorable to Bobo, it is not obligated to adopt his otherwise unsupported factual statements if they are "blatantly contradicted" by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Reed v. City of St. Charles, Missouri,* 561 F.3d 788, 790-91 (8th Cir. 2009) (holding that plaintiff may not merely point to unsupported self-serving allegations, but must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor … without resort to 'speculation, conjecture, or fantasy'").

2.      Bobo's Excessive Force Claim

According to Bobo's Complaint, Pfitzner used excessive force against him in the metal detector area on November 10, 2017 by: (a) initially spraying him with OC spray "with no warning whatsoever" and for "absolutely no reason," when "all [Bobo] did was walk away" in a non-threatening manner; (b) spraying him a second time "in [an] unprofessional and untrained mode of thinking"; and (c) acting "aggressive towards [Bobo]" and then, along with other officers, "slamming" him against the floor while his hands were restrained behind his back.[12] *Doc. 2 at 4-5*.

In evaluating Eighth Amendment excessive force claims, the core judicial inquiry is whether the relevant force was applied in a good-faith effort to maintain discipline, or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). In making that determination, courts must consider: (a) the need for application of force; (b) the relationship between that need and the amount of force used; (c) the threat reasonably perceived by the responsible officials; (d) any efforts made to temper the severity of a forceful response; and (e) the extent of the injury inflicted. *See Ward v. Smith*, 844 F.3d 717, 721-722 (8th Cir.

---

[12]As explained in paragraph 27 of the Court's recitation of the undisputed facts, Bobo *admitted* in his deposition that Pfitzner was *not* involved in taking him to the ground. *Doc. 41, Ex. B at 25, 34-36*. Accordingly, the only still viable excessive force claims that Bobo has asserted against Pfitzner relate to him deploying two short bursts of OC spray in response to Bobo's aggressive behavior and his repeated refusal to obey direct orders to go through the metal detector and catch the cuffs.

2016); *Walker v. Bowersox*, 526 F.3d 1186, 1188 (8th Cir. 2008); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).

The Eighth Circuit has recognized that a correction officer's limited use of chemical spray, to control a recalcitrant inmate, constitutes a "tempered response" when compared to other forms of force. However, the Court has identified "additional factors" that may need to be considered in evaluating whether the officer is entitled to qualified immunity: (a) was a warning given before the chemical spray was used; (b) was there a purpose for using the chemical spray, other than to inflict pain; (c) were "super-soaker" quantities of the chemical used; (d) was the inmate not allowed to wash off the chemical for a prolonged period of time; and (e) in addition to using the chemical spray, was physical force used. *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014); *Walker*, 526 F.3d at 1189; *Treats*, 308 F.3d at 873; *Lawrence v. Bowersox*, 297 F.3d 727, 730, 732 (8th Cir. 2002); *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000).

With regard to Pfitzner's discharge of the initial short burst of chemical spray, the undisputed facts establish that Bobo: (a) walked *around* the metal detector, rather than through it as he knew he was supposed to do; (b) set off the metal detector as he walked past it; (c) refused Pfitzner's direct orders to "come back" and "clear" the detector; (d) continued walking away from Pfitzner, without going back through the

18

metal detector; (e) refused to comply with other direct orders from Pfitzner to stop, come back, and walk through the metal detector; (f) aggressively challenged Pfitzner's orders and turned away from him; (g) verbally challenged Pfitzner about pulling out his OC spray, while crouching in a "defensive position" three or four feet away from Pfitzner; (h) refused to comply with Pfitzner's third series of orders to stop, come back and go through the metal detector; and (i) turned around and walked away from Pfitzner, which resulted in Pfitzner discharging a short burst of OC spray that made contact with the back of Bobo's head.

With regard to Pfitzner's second use of a short burst of OC spray, the undisputed facts are that Bobo: (a) refused to comply with Pfitzner's direct orders to catch the cuffs; (b) defiantly challenged Pfitzner's previous use of OC spray and refused his orders to face the wall and catch the cuffs; and (c) assumed an aggressive stance that suggested he might attack Pfitzner.

These undisputed facts are supported by the declarations of Pfitzner, Melton, Watson, and four inmate witnesses. They also were largely admitted by Bobo during his deposition. Together, these facts, viewed in a light most favorable to Bobo, establish that: (a) Pfitzner was alone when he was confronted with a rapidly escalating situation involving Bobo, whose behavior in repeatedly refusing to go through the metal detector, and then walking away, suggested he might well have a

weapon; (b) Bobo engaged in aggressive and threatening behavior, including repeatedly refusing to comply with direct orders; and (c) to gain control over this situation, and get a recalcitrant, belligerent, and potentially armed prisoner to comply with his orders, Pfitzner deployed two short bursts of OC spray. *Nothing* about his actions suggests that Pfitzner used the OC spray to inflict pain. Rather, his need to use two short bursts of OC spray arose from Bobo repeatedly refusing to obey his orders, engaging in aggressive and threatening behavior, and, finally, refusing to allow Pfitzner to place him in handcuffs. Apart from deploying two short bursts of OC spray, which made contact with the back of Bobo's head and possibly his back or chest, Pfitzner used *no physical force*. Finally, within five minutes after he was sprayed, Bobo was placed in the shower to decontaminate.

These undisputed facts, viewed in a light most favorable to Bobo, simply would not allow any reasonable fact-finder to conclude that Pfitzner used excessive force against Bobo during the November 10, 2017 incident, or otherwise violated Bobo's constitutional rights.

Accordingly, Pfitzner is entitled to qualified immunity on all of the excessive force claims Bobo has asserted against him. Pfitzner's Motion for Summary Judgment should be granted and this case should be dismissed, with prejudice.

## IV. Conclusion

IT IS THEREFORE RECOMMENDED THAT Pfitzner's Second Motion for Summary Judgment (*Doc. 41*) be GRANTED, and that this case, in its entirety, be dismissed, with prejudice.

DATED this 27th day of January, 2020.

_____
UNITED STATES MAGISTRATE JUDGE